# **EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 00-0105 (PLF) |
| | ) | Civil Action No. 05-0555 |
| BYRON MCDADE, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

This matter is before the Court following an evidentiary hearing on defendant Byron McDade's amended motion to vacate, set aside or correct his sentence, pursuant to 28 U.S.C. § 2255. For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that defendant's motion to vacate, set aside or correct his sentence [334] is DENIED and Civil Action No. 05-0555 is DISMISSED. This is a final appealable Order. See Rule 4(a), Fed. R. App. P.; it is

FURTHER ORDERED that the Clerk of the Court shall send a copy of the Opinion to the Director of the Bureau of Prisons; and it is

FURTHER ORDERED that the Clerk of the Court shall send a copy of the Opinion to the Office of the Pardon Attorney at the Department of Justice.

SO ORDERED.

/s/
PAUL L. FRIEDMAN
United States District Judge

DATE: August 5, 2009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                              )<br>)<br>BYRON MCDADE,                   )<br>)<br>      Defendant.              )<br>_____) | Criminal No. 00-0105 (PLF)<br>Civil Action No. 05-0555 |

OPINION

This matter is before the Court following an evidentiary hearing on defendant Byron McDade's amended motion to vacate, set aside or correct his sentence, pursuant to 28 U.S.C. § 2255. The defendant argues that: (1) his amended motion on the issue of the ineffective assistance of his trial counsel was timely filed; (2) his trial counsel was ineffective; and (3) the Court has authority to re-sentence the defendant regardless of how it rules on the issue of ineffective assistance of counsel. Upon consideration of the papers filed by the defendant and the government, the transcript of the trial in this case, the evidence presented during the evidentiary hearing, and the entire record in the case, the Court will deny the defendant's motion to vacate his sentence and concludes that it does not have the authority to re-sentence defendant.[1] Recognizing, however, that the Court was required to impose a twenty-seven year sentence and

---

[1] The Court will use the following abbreviations in this Opinion for references to the proceedings and filings cited: Evidentiary Hearing Transcript ("Tr. Evid."); Trial Transcript ("Tr. Volume #"); Defendant's Supplemental Memorandum (Apr. 23, 2008) ("Def. Supp. Memo."); United States' Opposition to Defendant's Motion to Vacate, Set Aside or Correct Sentence and Response to Defendant's Supplemental Memorandum ("Govt. Opp."); and Petitioner's Response to Respondent's Opposition to Petitioner's Supplemental Memorandum to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Def. Reply").

that the sentence is dramatically disproportionate to the sentences received by Mr. McDade's former co-defendants and the other co-conspirators, the Court urges the Bureau of Prisons to file a motion for sentence reduction and recommends executive clemency after fifteen years have been served.

## I. BACKGROUND

On March 16, 2000, a federal grand jury indicted the defendant, Byron Lamont McDade, along with four others, on one count of conspiring to distribute five kilograms or more of a mixture or substance containing cocaine in violation of 21 U.S.C. § 846. After returning two superseding indictments, the grand jury returned a third and final superseding indictment on August 9, 2001, charging the defendant with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine.

A jury trial was held before this Court from February 4, 2002 to February 25, 2002. Most of the witnesses at trial were former co-defendants or others involved in the conspiracy who had negotiated pleas with the government and were awaiting sentencing. The jury found the defendant guilty as charged. Accordingly, on May 29, 2002, the Court sentenced the defendant under the then mandatory United States Sentencing Guidelines to imprisonment for a term of 324 months, with credit for any time served. See Judgment and Commitment, Dkt. No. 278 at 2. The maximum period of incarceration for this conviction is life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(ii).

The defendant filed a timely notice of appeal. The United States Court of Appeals for the District of Columbia Circuit affirmed the judgment of this Court. See United States v.

2

McDade, No. 02-3054, 2003 WL 22204126 (D.C. Cir. Sept. 16, 2003) (*per curiam*). The defendant filed a petition for a writ of certiorari, which the Supreme Court of the United States denied on March 8, 2004. See McDade v. United States, 541 U.S. 911 (2004).

On March 7, 2005, the defendant filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. In that motion, the defendant asserted the following two legal arguments: (1) that the sentence the Court had imposed violated the defendant's constitutional rights based on the recently decided case of United States v. Booker, 543 U.S. 220 (2005), because the Court based its sentence, in part, on facts that the jury did not find beyond a reasonable doubt; and (2) that the defendant received ineffective assistance from his appellate counsel for failure to challenge the validity of the defendant's sentence under Apprendi v. New Jersey, 530 U.S. 466 (2000). On April 8, 2005, the defendant filed an amended Section 2255 motion that asserted the additional argument that the defendant received ineffective assistance from his trial counsel, insofar as trial counsel failed to interview and present the testimony of three potential defense witnesses.

On January 4, 2006, this Court denied the defendant's challenges to his sentence based on Booker, and the claim that appellate counsel was ineffective. See United States v. McDade, Memorandum Opinion and Order, Dkt. No. 345 at 5, 7 (D.D.C. Jan. 4, 2006). The Court directed the government to address the merits of the defendant's claim that his trial counsel was ineffective. See id. at 8. The Court subsequently concluded that it was not able to determine whether trial counsel made sound tactical or strategic decisions based on the trial transcripts alone — specifically, "whether trial counsel knew of the existence of these witnesses, whether they tried to contact them and, if not, why not, and whether they made a conscious decision not to

put them on the witness stand at trial." United States v. McDade, Memorandum Opinion and Order, Dkt. No. 348 at 5, 7 (D.D.C. May 3, 2007). On January 15, 2008, the Court held an evidentiary hearing on the defendant's ineffective assistance of trial counsel claim. The Court heard testimony from Mr. McDade, Kent Robinson, and Larry Nathans, Mr. McDade's lead trial counsel. All parties agreed that it was unnecessary for the Court to hear testimony from Mr. Nathan's co-counsel, Robert Biddle. See Tr. Evid. at 97. At the conclusion of the evidentiary hearing, the Court requested that the parties file supplemental memoranda to further address the defendant's claims.

## II. DISCUSSION

### A. Ineffective Assistance of Trial Counsel [2]

To prevail on this claim, the defendant bears the burden of satisfying both prongs of a constitutional claim of ineffective assistance of counsel as articulated by the Supreme Court in Strickland v. Washington: that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). The second, or "prejudice" prong of the Strickland test is based on the Supreme Court's judgment that "'[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment.'" Hill v. Lockhart, 474 U.S. 52, 57 (1985) (quoting Strickland v.

---

[2] Although the government argues that defendant's argument on this issue is time-barred, the Court finds it more efficient to address the defendant's claim on its merits first.

4

Washington, 466 U.S. at 691). Thus, "there is no reason for a court deciding an ineffective assistance of counsel claim to . . . address both components of the inquiry if the defendant has made an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697. Furthermore, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 688. As the Supreme Court has explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation [of attorney conduct], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

As noted, Mr. McDade's conviction was based largely on the trial testimony of other members of the conspiracy. The primary witnesses against Mr. McDade were Phyllis Webster and Ernest Minder. According to Webster, the original leader of the conspiracy, about four years into it she enlisted Mr. McDade to join her in a leadership role and turned over significant responsibilities to him. See Tr. Volume VII at 1088; Tr. Volume X at 1420; Tr. Volume XI at 1581. Three narcotics purchasers also testified as to Mr. McDade's significant role in the conspiracy; of these witnesses, in the Court's opinion, Ernest Minder's testimony was the most damaging. See Tr. Volume X at 1403–04, 1406–07, 1412. The defendant did not testify,

5

nor did he call any witnesses. The defense theory was that the members of the conspiracy who testified were not credible because all were criminals and known drug dealers, and all had an incentive to lie under oath and implicate the defendant because they had pled guilty and were awaiting sentencing. The strength of the defendant's case depended on the credibility, or lack thereof, of the government's witnesses, especially Webster and Minder.

Mr. McDade claims that in this context it was objectively unreasonable for his trial attorney, Larry Nathans, not to investigate or interview readily available potential defense witnesses identified by Mr. McDade, specifically, Rodney Douglas, David Flowers and Kent Robinson. See Def. Supp. Memo. at 7–8. Mr. McDade asserts that those individuals would have been able to contradict the testimony of key government witnesses, particularly Minder and Webster. Id. The government responds that trial counsel's decision not to pursue the three individuals was a "reasonable strategic decision," and that, even if the Court were to find counsel's decision to be objectively unreasonable, the government could have easily explained away any discrepancies in the witnesses' testimony to the jury. Gov. Opp. at 35–36, 38. The government argues, therefore, that there was no prejudice because the outcome of the trial would not have been different. See id. Mr. McDade argues that his trial counsel's decision not to interview the potential witnesses was not a "strategic decision," and that any investigation would have allowed counsel to discern, "at a minimum . . . whether they had any information . . . beneficial to the defense." Def. Reply at 7. Furthermore, Mr. McDade argues that Douglas, Flowers and Robinson would have given the jury substantial reasons to question the credibility of government witnesses, buttressed trial counsel's strategy, and "created more equilibrium in the evidence presented to the jury." Id. at 4, 11.

6

With respect to the first prong of an ineffective assistance of counsel claim — whether "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. at 688 — the Court finds that, in light of counsel's overall conduct, the decision not to call Douglas, Flowers and Robinson as defense witnesses was not objectively unreasonable, nor was the decision not to interview Douglas and Flowers. On the other hand, the Court concludes that it was *objectively unreasonable* for Mr. Nathans not to interview Robinson.

Putting its conclusions in context, the Court first notes that the record of the trial and the evidence adduced at the evidentiary hearing establish that Mr. Nathans otherwise effectively represented the defendant, both before and during trial. Generally, in judging counsel's performance, the Court is to look at counsel's conduct "in light of all the circumstances." Strickland v. Washington, 466 U.S. at 689-90. Mr. Nathans conducted background checks on individuals whom the government declared it would call as witnesses and some whom Mr. Nathans anticipated that it might call (not including Douglas, Flowers, or Robinson). See Tr. Evid. at 39, 82. Mr. Nathans issued subpoenas, filed pretrial motions, applied for court orders, obtained tax and Motor Vehicle Administration records, and reviewed all discovery material with Mr. McDade. See id. at 38, 41–42, 45. He effectively cross-examined the government's witnesses and effectively argued the defendant's theory of the case. Mr. Nathans's strategy was to "show a connection between all the [government] witnesses" and Phyllis Webster, who was the centerpiece of the conspiracy. See id. at 40, 44. Part of the defense theory was to show that Webster controlled the information between witnesses as the case was ongoing and gave signals to other witnesses, even as to what to say at trial. See id. at 40.

7

Furthermore, Mr. Nathans tried to show at trial that all of the government's witnesses were "criminals" and "scoundrels" who have had a history of "possessing weapons" and dealing drugs and were testifying against the defendant only because they had "cut deals seeking reduced sentences;" hence, he argued to the jury, they were "not credible witnesses." Tr. Volume IV at 595–96. Mr. Nathans then emphasized each witness's criminal history, role in the drug conspiracy, and the length of sentences they would likely have received if they had not pled guilty and agreed to cooperate. See, e.g., id. at 595; Tr. Volume VIII at 1223–24, 1227–28, 1230. By contrast, Mr. Nathans portrayed Mr. McDade as a hard-working family man with a good job at Waste Management. See Tr. Volume IV at 597. He attempted to show that Mr. McDade was an "easy fall guy" who did not have a criminal record, and unlike the others, was not captured on the wiretaps doing any drug deals. See Tr. Evid. at 45. Once Mr. McDade had decided to go to trial, this strategy was reasonable. In the context of the trial record *as a whole*, Mr. Nathans's performance did not violate the first prong of Strickland.

The Court will now consider counsel's conduct with respect to each of the potential witnesses identified by Mr. McDade before trial but whom Mr. Nathans did not interview. With respect to Douglas and Flowers, Mr. McDade testified at the evidentiary hearing that while Mr. McDade was incarcerated at the District of Columbia Jail before trial, Douglas and Flowers each told him that they had spoken separately to Ernest Minder, a government cooperator and a co-conspirator who was also at the Jail, and that Minder had told each of them that he did not know Mr. McDade. See Tr. Evid. at 15–19, 27–29, 30–31. According to Mr. McDade, he relayed this information to Mr. Nathans, see id. at 19–21, 25, 27–29, 30–31, and Mr. Nathans said that he would pursue it. See id. at 21. Mr. Nathans agrees that Mr. McDade did

8

give him such information about Douglas. See id. at 49; Gov. Opp., Exh. B, Telephone Message Slip (Jan. 30, 2009). Contrary to Mr. McDade's testimony that Mr. Nathans agreed to look into the matter, however, Mr. Nathans testified that he and Mr. McDade had jointly agreed not to pursue Douglas as a witness. See Tr. Evid. at 49–51, 76–77. Mr. Nathans's testimony is corroborated by his contemporaneous notes. See also Gov. Opp., Exh. C, Handwritten Notes (Feb. 1, 2002). The Court will credit Mr. Nathans's testimony.

Mr. Nathans's proffered reasons for not pursuing Douglas as a witness show that this decision was a reasonable strategy. Mr. Nathans stated that in his professional judgment he did not regard the testimony of Douglas, or anyone else incarcerated with Minder at the Jail, as likely to discredit Minder as a witness. See Tr. Evid. at 50–51, 78–80. Mr. Nathans concluded that it would have been fairly easy for the government to explain away Minder's denial that he even knew Mr. McDade, made to Douglas and Flowers, by indicating that in the drug business, it would have been dangerous for Minder to admit that he was cooperating with law enforcement or that he in fact knew Mr. McDade. See id. at 49, 54. This conclusion makes sense, particularly because Mr. Nathans knew that Minder and Mr. McDade *did* know each other. See Tr. Evid. at 79–80. Furthermore, Mr. Nathans reasoned that he had many other areas of cross-examination with which to impeach Minder's credibility, and that Douglas's testimony would have been of relatively minor value. See id. at 51, 53, 78–79. During his cross-examination of Minder, Mr. Biddle, Mr. Nathans's co-counsel, focused extensively on Minder's history of lying for his own gain. See Tr. Volume X at 1468–71. In addition, since the defense strategy was to present Mr. McDade as someone without criminal associations, Mr. Nathans explained, calling witnesses who were inmates convicted of gun crimes and who approached a government witness in

9

protective custody would be counter-productive. See Tr. Evid. at 50, 52–53, 54. Mr. Nathans further explained that he wanted to emphasize to the jury that the government's witnesses were criminals seeking a reduction in their own sentences by exploiting Mr. McDade. See id. at 44–45, 52. This was a reasonable strategy.

The same rationale would justify a decision by Mr. Nathans not to interview Flowers or to call him as a witness. Mr. Nathans, however, does not recall having any conversations with Mr. McDade with respect to Flowers, see Tr. Evid. at 46, 51, 55, 77, as Flowers's name does not appear in Mr. Nathans's notes. Nonetheless, as Mr. Nathans testified, even if Mr. McDade had told him about Flowers, Mr. Nathans would have decided not to pursue Flowers as a witness for the same reasons he did not pursue Douglas. See id. at 52. Relying on the same reasoning described immediately above, the Court finds that Mr. Nathans's decision not to pursue Flowers was not objectively unreasonable.

By contrast, Mr. Nathans's failure to pursue the third potential witness, Kent Robinson, was not objectively reasonable. Mr. McDade testified that in the discovery material provided by the government, Phyllis Webster indicated that Robinson had introduced Mr. McDade to her. See Tr. Evid. at 22–23, 31. Mr. McDade, however, told Mr. Nathans that Robinson would testify that he did not introduce the two, which would undermine the credibility of Webster. See id. According to Mr. McDade, Mr. Nathans indicated that he would look into the matter. See id. at 23. Mr. McDade also testified at the evidentiary hearing that during Webster's trial testimony, Mr. McDade tapped Mr. Nathans on the shoulder and again said that Robinson would contradict Webster's testimony if called as a defense witness. See id. at 23–24, 31. According to Mr. McDade, Mr. Nathans once again indicated that he would follow up on

10

calling Robinson as a witness. See id. Mr. Nathans has notes taken at pretrial meetings with Mr. McDade which indicate that "client [does not] want to call Kent Robinson." Gov. Opp., Exh. D; see also Tr. Evid. at 60, 63. Mr. Nathans did not provide the Court with any corroborating notes to indicate whether Mr. McDade again raised the matter during Webster's testimony.

Mr. Nathans's contemporaneous notes inform the Court that, at least initially, Mr. McDade did not wish to call Robinson as a defense witness, and the Court credits Mr. Nathans's testimony, corroborated by his notes, on this score. Without any corroborating notes about the shoulder-tapping during Webster's testimony and Mr. Nathans's lack of recollection of this having occurred, however, see id. at 23–24, 31; Tr. Evid. at 64, 70, the Court is unable to reach a conclusion as to whether Mr. McDade did or did not change his mind as the trial proceeded. It therefore must look to Mr. Nathans's reasoning as to why he did not even conduct an investigation with respect to Robinson. Mr. Nathans testified at the evidentiary hearing that he suspected that the government possessed information on Robinson that could be damaging to his client, see Tr. Evid. at 62–63, 73–74, and that he did not have any information that suggested that Robinson would be helpful to Mr. McDade. See id. at 73. But because Mr. Nathans did not conduct any investigation with respect to Robinson, the Court cannot find that Mr. Nathans possessed sufficient information about Robinson's likely testimony to make a reasoned judgment that the risk of putting Robinson on the stand outweighed the potential impeachment value. On the record before it, the Court finds that Mr. Nathans should at least have interviewed Robinson, despite misgivings about him as a potential defense witness. As the court of appeals has observed: "The complete failure to investigate potentially corroborating witnesses . . . can hardly be considered a tactical decision." United States v. Debango, 780 F.2d 81, 85 (D.C. Cir. 1986).

11

Having concluded that Mr. Nathans's strategy was not objectively reasonable with respect to potential defense witness Kent Robinson, the Court will now address the prejudice prong: Did the decision not to conduct an investigation of or interview Robinson affect the outcome of the trial? See Strickland v. Washington, 466 U.S. at 694. Robinson testified at the evidentiary hearing that had he been a witness at trial, he would have contradicted Webster's testimony that Robinson had introduced Webster to McDade. See Tr. Evid. at 103. But, Robinson continued, "[o]utside of the specific question that his attorney was asking . . . in regards to did I introduce [defendant] to [Webster], that would probably be the only question that I would have answered at that time. And any other questions I would have invoked the Fifth Amendment to protect myself." Id. at 108. Thus, Robinson's testimony, if permitted, would only have added the fact that Webster and Mr. McDade did not meet through Robinson. Mr. McDade's argument concerning the importance of this testimony necessarily is based on an assumption that the Court would have permitted Robinson to testify selectively before the jury by asserting his Fifth Amendment privilege with respect to some relevant questions and not others — a dubious proposition at best. See United States v. Fuentez, 231 F.3d 700, 707 (10th Cir. 2000) (court properly disallowed testimony of witness who invoked Fifth Amendment privilege); United States v. Klinger, 128 F.3d 705, 709 (9th Cir. 1997) (court may refuse to permit witness to testify when witness's assertion of Fifth Amendment privilege hinders proper cross-examination); United States v. Plescia, 48 F.3d 1452, 1464 (7th Cir. 1995) (court properly refused to allow witness to testify when witness's assertion of Fifth Amendment "precludes effective cross-examination").

While the proffered testimony of Robinson might have tarnished Webster's credibility slightly, the jury already knew that Webster and Mr. McDade did in fact know and interact with each other from the testimony of other witnesses at trial. Furthermore, as Mr. Nathans's cross-examination of Webster had already undermined her credibility, the limited testimony from Robinson would have added little. See United States v. Mathis, Criminal No. 97-0334, 2005 WL 692082 at *12 (D.D.C. Mar. 24, 2005) (counsel was not ineffective for not pursuing an available impeachment technique when the witness's "credibility had already been called into question during cross-examination . . . [T]he jury was aware of [the] lengthy criminal record, knew he was testifying as part of a 'deal' with the Government to shorten an impending sentence, and heard him make two statements the defense later proved were inaccurate").

Finally, Mr. Nathans's argument that the government's witnesses were not credible — in part because of their substantial criminal records — would have been undermined had Mr. McDade relied on Robinson as a defense witness because Robinson *also* had a criminal history and was considered by the government to be an unindicted co-conspirator. See Tr. Evid. at 105. Robinson's absence did not prejudice the outcome of the trial. See, e.g., United States v. Weaver, 234 F.3d 42, 48 (D.C. Cir. 2000) (affirming denial of Section 2255 motion because the outcome of the trial would not have been different had counsel used additional means to impeach a government witness). The Court concludes that Mr. McDade's trial counsel was not constitutionally ineffective.[3]

---

[3] Because the Court has concluded that Mr. McDade's motion will be denied on the merits with respect to this issue, it need not address the government's argument that Mr. McDade did not raise the issue of the ineffectiveness of his trial counsel in a timely fashion.

13

### *B. Authority to Re-Sentence*

Defense counsel cites United States v. Coles, 403 F.3d 764 (D.C. Cir. 2005), as authority for the retroactive application of United States v. Booker, 543 U.S. 220 (2005), to re-sentence Mr. McDade. The so-called Coles remand applies only to cases that were on direct appeal at the time Booker was decided and simply does not apply to challenges on collateral review, a rule that the court of appeals has made clear in the time since Mr. McDade filed his motion to vacate. See United States v. Branham, 515 F.3d 1268, 1278 (D.C. Cir. 2008). In Booker, the Supreme Court specifically stated that its decision applied "to all cases on direct review." The opinion "included no explicit language about the retroactive application of its decision to cases on collateral review where the sentencing occurred under the old mandatory sentencing regime." See United States v. Agramonte, 366 F.Supp.2d 83, 87 (D.D.C. 2005), aff'd, 304 Fed.Appx. 877 (D.C. Cir. 2008). But the court of appeals has since held that Booker does not apply retroactively to cases on collateral review because the Supreme Court "announced neither a substantive rule nor a watershed rule of procedure." In re Fashina, 486 F.3d 1300, 1303, 1306 (D.C. Cir. 2007); see also United States v. Branham, 515 F.3d at 1278 ("Booker does not apply retroactively to cases on collateral review."). Defense counsel's argument that the Court has authority to re-sentence Mr. McDade requires that Booker apply retroactively to cases on collateral review, which is simply not the law in this Circuit. The Court does not have the authority to re-sentence Mr. McDade, despite its belief that the sentence is too long and disproportionate.

*C. Recommendations*

Twenty-seven years is a very long time. None of Mr. McDade's former co-defendants or co-conspirators received more than a seven-and-one-half year sentence. While each of them pled guilty and provided substantial assistance to the government by testifying against Mr. McDade (and some provided assistance in other ways), this sentence is disproportionate. Indeed, had Mr. McDade not exercised his constitutional right to a jury trial and instead pled guilty, the likely sentence under even a mandatory Guideline regime would have been approximately 168 months, approximately half the sentence the Court was required to impose after Mr. McDade was found guilty at trial.[4] Had the Sentencing Guidelines been advisory in 2002, or if Booker were retroactive now, the Court would vary substantially from the Guideline sentence of 324 months. This Court, however, is without authority to reduce Mr. McDade's sentence at this juncture.

The Court may, however, "upon motion of the Director of the Bureau of Prisons . . . reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1). While the Court "lack[s] jurisdiction to issue a writ of mandamus compelling the Director to seek a sentence reduction for an inmate," Defeo v. Lapin, Civil Action No. 08-7513, 2009 WL 1788056 at *3 (S.D.N.Y. June

---

[4] Under the Federal Sentencing Guidelines, the Base Offense Level for 150 kilograms or more of cocaine is 38. Had Mr. McDade pled guilty, he would have received a three level downward adjustment for acceptance of responsibility pursuant to Section 3E1.1 of the Guidelines, to Offense Level 35. As part of the plea agreement, Mr. McDade's managerial role in the conspiracy, a three level upward adjustment under Section 3B1.1, likely would have been negotiated away, leaving the Offense Level at 35. At Criminal History Category I, Mr. McDade's sentence would have been between 168 and 210 months. The Court would have imposed a sentence of 168 months.

22, 2009), the Court urges the Director to do so in this case in his discretion. The Court will direct the Clerk's Office to send a copy of this Opinion to the Director of the Bureau of Prisons for consideration of a motion to reduce Mr. McDade's sentence.

In addition, the Court urges the President to consider executive clemency for Mr. McDade and to reduce Mr. McDade's sentence to fifteen years in prison followed by a substituted term of supervised release. See United States v. Harvey, 946 F.2d 1375, 1378 (8th Cir. 1991) ("[E]xecutive clemency is one of the 'flexible techniques' for modifying sentences."); United States v. Angelos, 345 F.Supp.2d 1227, 1267 (D. Utah. 2004) ("Given that the President has exclusive power to commute sentences . . . such a [judicial] recommendation is entirely proper."). The Court directs the Clerk's Office to send a copy of this Opinion to the Office of the Pardon Attorney in the United States Department of Justice to be forwarded to the President for clemency consideration.

For the foregoing reasons, the defendant's motion for relief under 28 U.S.C. § 2255 is denied. An Order consistent with this Opinion will issue this same day.

/s/
PAUL L. FRIEDMAN
DATE: August 5, 2009          United States District Judge

16